IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES ANTHONY DAVIS,

                      Plaintiff,

  v.                                                     ORDER

BRIAN PILLER,                                   14-cv-687-jdp

                      Defendant.

---

      Plaintiff James Anthony Davis, who is represented by volunteer counsel recruited by the court, is proceeding on claims that defendant Brian Piller violated his constitutional rights by fabricating a report that Davis had overdosed on drugs. Davis contends that Piller's false report caused him to be subjected to unnecessary and painful medical procedures to treat the non-existent overdose. Before the court is Piller's motion for summary judgment. Dkt. 28. Having reviewed the parties' arguments and evidence in the record, I conclude that the motion must be granted. Although there is a genuine factual dispute regarding whether Piller falsified his report about Davis's overdose, the dispute ultimately is immaterial to Davis's constitutional claims. Even accepting Davis's version of events as true, no reasonable jury could conclude that Piller's actions violated Davis's substantive due process rights or amounted to deliberate indifference under the Eighth Amendment. Accordingly, I will grant Piller's motion for summary judgment and dismiss this case.

UNDISPUTED FACTS

      At times relevant to this case, Davis was incarcerated at Dodge Correctional Institution, where Brian Piller worked as a correctional officer. According to Davis's mental health records,

he has a history of anger, impulsivity, and mental health problems. He has attempted suicide on approximately 40 occasions, by cutting himself, hanging himself, and overdosing on medication. While incarcerated at Dodge Correctional, Davis spent a significant amount of time in segregation and under observation status. Correctional officers in the segregation unit are supposed to check inmates on observation status every 15 minutes to ensure that they are not harming themselves. During the times Davis was on observation status, he insulted correctional officers and many officers thought he was unpleasant.

On April 28, 2011, two days before the incident at issue in this case, Davis met with a prison psychiatrist, Dr. Shirley Dawson. Dawson noted that Davis had stopped taking some of his medication and as a result, was decompensating and hearing voices that were telling him to kill himself. She also noted that Davis wanted to be moved to a different institution and that he threatened to kill himself if he was not transferred. He also reported that he was in danger from various murderers who lived at Dodge Correctional. Dawson's impressions were that Davis had stopped taking his antipsychotic medication and was in the middle of a paranoid episode. Dkt. 32-1 at 16. Dawson noted that "during these times Davis uses threats of harm to himself to get what he wants." *Id.* At the time, Davis was housed in the segregation unit and was in observation status.

On the morning of May 1, Piller was the correctional officer responsible for performing observation checks on Davis every 15 minutes. Throughout the morning, Davis and Piller exchanged insults and had several unpleasant interactions. At approximately 10:00 a.m., Piller approached Davis's cell to conduct a status check. Davis asked Piller when he would be taken off of observation status, and Piller responded that Davis probably would not be taken off observation until the next day at the earliest.

The parties dispute what happened next. According to Piller, after he told Davis that he would not be taken off observation that day, Davis responded by showing Piller what appeared to be a handful of white pills and stating, "I am going to get out of here one way or another by taking these." Davis then placed the pills in his mouth. Piller immediately shut off the water in Davis's cell to try and prevent him from drinking water that could assist him in swallowing the pills. Piller then alerted the sergeant on duty that Davis had taken a handful of pills. Piller asked Davis was he had taken, and Davis responded that he had swallowed 1200 mg of Trazodone and 6–9 mg of Risperidone. Davis told Piller that he had saved the pills by swallowing them halfway and then regurgitating them once the medication pass officer walked away from his cell. Piller later checked Davis's medication record and confirmed that Davis had been prescriptions for both Trazodone and Risperidone.

Davis denies making any gestures or saying anything to Piller to suggest that he took pills or intended to commit suicide. According to Davis, he insulted Piller and Piller became angry. Piller then said, "Watch this," called his supervisor over, and falsely stated that Davis had attempted to commit suicide by overdose.

The parties agree that once the captain on duty arrived at Davis's cell, officers searched Davis but they found no pills on Davis or in his cell. Piller and other staff members escorted Davis to the health services exam room on the segregation unit where Nurse Julie Wempner assessed Davis. Wempner decided that Davis should be sent to the hospital for evaluation and treatment. According to Wempner, it was standard procedure to send any prisoner to the hospital for treatment if a correctional officer and the prisoner reported an overdose. Wempner's notes from her meeting with Davis state that he told her that he took pills to try to kill himself and to "get out of here." Dkt. 32-1 at 2. He also told her that he felt "higher

than I've ever felt in my life." *Id.* Davis denies saying anything to Wempner to suggest that he had taken pills or attempted to commit suicide by overdose, but he has not alleged that he denied taking pills, that he told Wempner that Piller was lying, or that he objected to Wempner's decision to send him to the hospital.

At the hospital, Davis was given an EKG and a urine drug screen. Davis was handcuffed during the procedures. Because Davis did not have to urinate at the emergency room, his urine was extracted with a catheter, which Davis says was extremely painful. Davis did not refuse the EKG or catheter and did not otherwise object to treatment at the hospital. His hospital records state that he was "calm" and "cooperative" and there is nothing in his hospital records suggesting that he denied taking pills. Dkt. 32-1 at 9. The drug screen came back negative. The hospital records state that after Davis was told the results, he reported that his abdomen hurt. *Id.* at 3, 11. Hospital medical staff recommended that Davis follow up with a primary care provider and be seen for a psychiatric evaluation after he returned to the prison *Id.* at 3, 6.

On May 5, 2011, Davis saw Dr. Dawson again. According to Dawson's notes, Davis "had an episode of claiming to have overdosed on his meds, which turns out not to be true." *Id.* at 17. Dawson noted that Davis reported to her that he was not trying to overdose on May 1, but that he had saved some of his pills and had not taken them right away. Dawson also noted that they discussed the need for Davis to take all of his medications immediately when they are distributed. *Id.* Davis denies telling Dawson that he had saved pills or suggesting to her that he had falsely reported overdosing on medication.

As a result of the incident, Piller wrote Davis a conduct report for violating Wisconsin Administrative Code § DOC 303.57, "Misuse of Prescription Medication." The conduct report stated that Davis had told Piller that he was going to "get out" of observation, that Davis had

4

placed a handful of pills in his mouth, and that Davis had told Piller that the pills were Tazodone and Risperidone that he had saved. Dkt. 31-2 at 1. Davis waived his right to a formal due process hearing on the conduct report and checked the box on the waiver form indicating, "I ADMIT I AM GUILTY." *Id.* at 4. At the May 6, 2011 disciplinary hearing on the conduct report, Davis stated that he "did not swallow no pills," but also stated, "I know I am guilty, I am just waiting to see what I get." *Id.* at 6.

Davis was released from prison on June 19, 2011. He was reincarcerated on April 19, 2013. After he was reincarcerated, Davis learned that DOC was deducting restitution from his prison account to pay for his May 1, 2011 hospital stay. He filed this lawsuit in October 2014. Davis says that he still experiences pain and other adverse consequences from the catheterization, including erectile disfunction.

ANALYSIS

Davis contends that Piller violated his constitutional rights by fabricating a story that Davis had attempted to kill himself by overdosing on medication. Ordinarily, as long as a prisoner receives due process before being punished and is not alleging retaliation, a prisoner cannot state a constitutional claim by alleging that "a prison guard planted false evidence which implicates an inmate in a disciplinary infraction." *Hanrahan v. Lane*, 747 F.2d 1137, 1141 (7th Cir. 1984). *See also Lagerstrom v. Kingston*, 463 F.3d 621, 625 (7th Cir. 2006). In this instance, however, Davis's allegations suggested that Piller's false story resulted in more than just a conduct report. Because Davis alleged that Piller intentionally caused him to be hospitalized unnecessarily, I permitted Davis to proceed on two constitutional claims: (1) he was forced to receive unwanted medical treatment, in violation of his substantive due process rights under

5

the Fourteenth Amendment; and (2) he was forced to receive invasive and humiliating medical treatment for no legitimate penological purpose, in violation of the Eighth Amendment.

After reviewing the evidence, I conclude that Davis cannot succeed on a Fourteenth Amendment substantive due process claim. As a general matter, "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278 (1990). In the prison context, this interest extends at least as far as refusing the unwanted administration of antipsychotic drugs. *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). But even accepting Davis's version of events as true, Davis has submitted no facts showing that Piller, or anyone else, forced him to receive unwanted medical treatment. Significantly, Davis does not say in his sworn declaration that he objected to any of the medical treatment he received at the time he received it. He also does not say that he reported to anyone that Piller had fabricated the overdose event. He does not even say that he denied taking pills to prison staff, Nurse Wempner, or hospital personnel. Instead, Davis says only that he "did not say anything to Nurse Wempner to suggest [he] took pills or attempted to commit suicide by overdose." Dkt. 51, ¶ 12. It is not clear what this means. Did Davis sit silently while Wempner evaluated him? As for hospital staff, Davis's declaration says nothing about what he said to the hospital medical staff who treated him, and my own review of the hospital records found no indication that Davis ever refused treatment or reported that the overdose had been fabricated. Instead, the medical records state that Davis was being seen for an overdose and that he was depressed, suicidal, calm, and cooperative. Based on this record, no reasonable jury could conclude that Davis was forced to receive unwanted medical treatment in violation of his substantive due process rights.

Davis's Eighth Amendment claim presents a different question. "The Eighth Amendment prohibits punishments that involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification." *Whitman v. Nesic,* 368 F.3d 931, 934 (7th Cir. 2004). *See also Hudson v. Palmer*, 468 U.S. 517, 530 (1984) (Eighth Amendment provides remedy for "calculated harassment unrelated to prison needs"); *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (Eighth Amendment prohibits "gratuitous infliction of suffering"). Davis contends that if a jury accepted his version of events as true, the jury could conclude that Piller made up the story about Davis overdosing solely for the purpose of harassing Davis.

The parties disagree about whether a reasonable jury could believe Davis's version of events. Davis contends that a reasonable jury could conclude that Piller lied about Davis overdosing because Piller did not like Davis and was tired of dealing with him. Davis points to the negative urine screen and the fact that officers never recovered any pills as evidence to support his version of events. In response, Piller argues that Davis's version of events is so incredible that no jury could believe it. Davis's medical records show that he was off his medications, hallucinating, complaining about his placement, and threatening suicide just two days before the incident. In addition, not only would a jury have to accept Davis's word over Piller's, but the jury would have to find that Nurse Wempner and Dr. Dawson falsified their progress notes by writing that Davis had confirmed taking, or at least confirmed that he pretended to take, pills that he had been hoarding. A jury would also have to find that Davis was lying when he admitted his guilt during the disciplinary proceedings.

Ultimately, I cannot resolve this factual dispute. I agree with Piller that a jury may well find Davis's version of events unbelievable, particularly because Davis has offered no possible

motivation for Nurse Wempner, Dr. Dawson, or himself, to lie about the incident in May 2011. Nonetheless, Davis's sworn statement creates a genuine factual dispute about what happened that cannot be resolved at summary judgment. *Orlowski v. Milwaukee Cty.*, 872 F.3d 417, 419 (7th Cir. 2017).

But I must also consider whether the factual dispute is material to the outcome of Davis's Eighth Amendment claim. If Piller made up the story about Davis's overdose, that would be deplorable, unprofessional conduct. But not every deplorable act of harassment by a prison guard amounts to "cruel an unusual punishment" under the Eighth Amendment. *Dobbey v. Illinois Dep't of Corr.*, 574 F.3d 443, 446 (7th Cir. 2009) (holding that guard's act of hanging noose in view of black inmates did not rise to level of constitution violation because, "harassment, while regrettable, is not what comes to mind when one thinks of 'cruel and unusual' punishment. Nor does it inflict injury comparable in gravity to failing to provide a prisoner with adequate medical care or with reasonable protection against the violence of other prisoners."). Eighth Amendment claims have both objective and subjective components. The objective prong asks whether the alleged deprivation or condition of confinement is "sufficiently serious" such that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotations omitted). If the conditions complained of pass this threshold, courts then must determine the prison official's subjective state of mind; that is, whether "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

Davis suggests that cases involving prison strip searches are analogous to Piller's conduct in this case. In those cases, a prison official's decision to strip search an inmate violates the

Eighth Amendment if the strip search is "maliciously motivated, unrelated to institutional security, and hence totally without penological justification," *Whitman*, 368 F.3d at 934, and is "conducted in a harassing manner intended to humiliate and inflict psychological pain." *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004). *See also Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (strip search violates Eighth Amendment if it amounts to "gratuitous infliction of suffering"). But Davis's evidence does not satisfy this standard. Although Piller had no penological justification for fabricating an overdose, Davis points to no evidence suggesting that Piller acted in a "harassing manner intended to humiliate and inflict psychological harm." For example, Davis does not say that Piller intimidated him, threatened him, ridiculed him, or otherwise subjected him to treatment that was particularly humiliating or psychologically damaging. *Compare Whitman*, 368 F.3d at 935 (no Eighth Amendment violation where there was no evidence that defendant "touch[ed], badger[ed], ridicule[ed], threaten[ed], or intimidate[ed]" prisoner during searches or that defendant "intended to deliberately harm" prisoner), *with Mays*, 575 F.3d at 650 (potential Eighth Amendment violation where prisoner alleged that he was subjected to daily strip searches in view of other inmates, that searches were performed in a cold room, that guards did not regularly change their latex gloves, and that guards made demeaning comments during searches). Here, Davis says that Piller knew that Davis would likely be drug tested as a result of his report, but Davis does not suggest that drug testing by itself is so humiliating or psychologically harmful such that being tested based on a guard's false statement would rise to the level of a constitutional violation. In fact, Davis does not identify any aspect of Piller's actions or Davis's resulting medical treatment that was humiliating or psychologically harmful. Instead, the only harm that

9

Davis discusses in particular is the pain he experienced as a result of his catheterization at the hospital.

On this subject, I agree with Piller that Davis's alleged injury from the catheterization was not a foreseeable result of Piller's actions. Piller frames this issue as one of "proximate cause," which is a standard element of tort liability. To succeed on his constitutional tort claim, Davis must prove that Piller's actions were the "proximate cause" of his injuries, meaning that his injuries are "of a type that a reasonable person would see as a likely result of his or her conduct." *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012). I agree with Piller that no reasonable jury could conclude that Piller would have anticipated that reporting an overdose would cause Davis to undergo a forced catheterization that would cause long-lasting effects.

The foreseeability of Davis's injury is also relevant to the state-of-mind prong of Davis's Eighth Amendment claim. A prison official violates the Eighth Amendment if the official acts with "deliberate indifference" to a known risk of harm to the inmate's health or safety. *Hope v. Pelzer*, 536 U.S. 730, 737 (2002). Regardless whether the risk at issue is physical injury or psychological humiliation, the plaintiff must present evidence that the defendant knew about the risk but consciously disregarded it. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 689 (7th Cir. 2012) ("[W]hether [defendant] knew [plaintiff] was at risk for [serious harm] yet consciously disregarded the risk [is] the subjective inquiry called for by the deliberate indifference standard."); *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008) (prison officials deliberately indifferent only if they "knew of a substantial risk of harm"). In this instance, Davis has not submitted evidence suggesting that Piller knew that Davis would face a substantial risk of serious physical or psychological harm if Piller reported that Davis had overdosed. At the most, Piller knew that Davis would likely be drug-tested. Dkt. 49, ¶ 13.

There is no evidence that Piller knew, or even had reason to suspect, what happened next: that Davis would fail to deny overdosing; that he would be transported outside the hospital for drug testing; or that Davis could be subjected to a painful catheterization and side effects. Thus, no reasonable jury could conclude that Piller acted with deliberate indifference to a substantial risk that Davis would suffer serious physical or psychological injury. *C.f. Lewis v. Stephens*, 710 F. App'x 703, 705 (7th Cir. 2018) (officer cannot be liable "for the manner in which others conducted the [strip] search" where there was no evidence that officer "ordered others to search him in a 'harassing manner intended to humiliate and cause psychological pain'").

For all of these reasons, I conclude that Davis has failed to submit evidence sufficient to defeat Piller's motion for summary judgment. Therefore, I will grant Piller's motion and dismiss this case.

### ORDER

IT IS ORDERED that defendant Brian Piller's motion for summary judgment, Dkt. 28, is GRANTED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered January 30, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge